Thank you, Your Honor. May it please the Court, Tara Morrissey for the government. In the final rule, CMS reasonably concluded that compensated costs are not uncompensated costs. Can I just stop you on a procedure? Something that seems important to me and I can't get it from the briefs. Was the 2017 rule adopted after full legislative rulemaking or was it adopted as an interpretive rule? Your Honor, that was adopted after full notice and comment procedures, so there's no procedural claim here. Where's the Federal Register cites to the full explanation and so forth and what objections were made and why they were rejected? Yes, Your Honor. The full final rule is at page 8215 of our appendix. And this came after a proposed rule was issued. The final rule was adopted April 3, 2017, and it goes through quite a few pages addressing comments that were received by various hospitals, making some of the same arguments that we see here. Was judicial review then sought in the D.C. Circuit? There is a case pending before the D.C. Circuit that challenges this rule. There's also a case pending in the Fifth Circuit that challenges this rule. On the rulemaking here? On the final rule. On the record of the legislative rulemaking, unlike this record? No, Your Honor. This case fully presents the final rule and the entire record. The plaintiffs brought two claims. They challenged the informal guidance. So does the Supreme Court allow these multiple challenges to legislative rules simultaneously in multiple circuits? Yes, Your Honor. It's the doctrine of non-acquiescence. The Supreme Court in Mendoza explained that in the principle that non-mutual collateral estoppel does not apply to the government. The government can litigate the same issue in multiple courts, and, in fact, that provides a Yes, but that's when it's been done somewhere. You just said they're pending in two other circuits. So why are we bothering with this? Correct. Then we should just hold it until the other circuits act? I don't think so, Your Honor. I'm offended by three circuits doing the same thing at the same time, possibly coming up with inconsistent rulings because we don't have the benefit of the other circuits' explanations. And then we get a conflict, and then we go to the Supreme Court. And that may be lovely for the lawyers, but it's terrible for the judiciary. Your Honor, the Supreme Court in Mendoza did say that the benefit of allowing the government to litigate issues in different courts is that it provides the Supreme Court with multiple reasoned decisions. Simultaneously? Yes. And this is how agency litigation has gone for years. Various agency roles are challenged. I've been doing agency things longer than you have, and it's not that common, as a lawyer and as a judge. We would encourage... It's unprecedented, but it's not that common, and courts should be wary of it. I mean, we're dealing now with dicta in a district court, because in a case that was primarily focused on fact 33, that you no longer appeal. Your Honor, it's not dicta. The court enjoined the government from enforcing the final rule. We have withdrawn the informal guidance, but there were two claims. The plaintiffs amended their complaint to challenge the final rule. That's a separate claim, and the district court ruled against us. The government is facing an injunction. Go ahead. Okay. Thanks for the clarifying. Each state has a limited pool of federal DISH funds, and the hospital gets a share of those funds only if it has uncompensated costs. The final rule tries to direct these limited funds to the hospitals that need them the most, and it does so by recognizing that payments by private insurance and Medicare are compensation. If I could give an example of two hypothetical hospitals to illustrate the consequences of the district court's approach of ignoring these payments. Hospital A serves privately insured Medicaid patients alone. It spends $1 million on treating those patients, and it receives $1 million from private insurance for those patients. It has been fully compensated and suffered no shortfall. Meanwhile, Hospital B serves Medicaid-only patients. It spends the same amount, but it's reimbursed at the lower Medicaid rate, so receives, say, $600,000. Now, Hospital B, unlike A, has suffered a shortfall, and you would think that it would be the hospital that is eligible to receive the most supplemental funding. Are there real numbers in this record? There are, Your Honor. Real hospitals? Yes. Not just A and B? Yes. The record shows that in 2011, Truman Medical Center Hospital Hill had $27 million in overpayments. Meanwhile, other hospitals in the state, and we noted two, including Children's Mercy and St. John's Mercy Washington, had a shortfall even after receiving these supplemental dish payments. Now, under Missouri's plan, those overpayments to Truman Medical Center and other hospitals that got overpayments would be redistributed to other hospitals in the state that actually have uncompensated costs. And that's the purpose of the dish payments is to provide a supplemental payment that helps fill the gap because Congress recognized that hospitals serving a large number of Medicaid and uninsured patients often have a gap. There is a shortfall. Counsel, I'm less concerned with sort of the policy and more concerned with the text. Sure. And I thought Judge Kethledge, in a Sixth Circuit opinion from a year or two ago, made a pretty good point. I want to hear the government's response about there's costs, there's payments, and there's net. And how do those things relate to each other? I mean, their core argument is that the rule conflicts with the text. So what's the government's response to that? That's right, Your Honor. If you look at the statute, it does not say there is no reference to gross costs. The sole term here is costs incurred. And I think that Judge Kethledge's opinion does not give the parenthetical that follows the full weight that it deserves. The full parenthetical includes two critical phrases. Costs incurred are both, as determined by the Secretary, and net of payments under Medicaid and by uninsured patients. Both of those phrases describe costs incurred. So we know that costs incurred cannot be merely a gross costs amount because Congress has described it as reflecting at least some payments. We also know that the Secretary has authority to determine costs incurred, a term that accounts for both costs and payments. So there's no basis for thinking that Congress foreclosed the Secretary from accounting for other types of payments. Is there an inconsistency between the two things found in the parenthetical in the sense that your argument is the Secretary has the ability or has delegated the power to determine what costs incurred are? But then there's a command in the statute that says minus Medicaid payments. So how do we deal with that? I think other circuits have referred to it as a superfluous argument. Some district courts have. The Sixth Circuit rejected. The majority rejected that argument. And that's because Congress specified net of Medicaid payments as a limitation on the Secretary's authority. The Secretary must, in determining costs incurred, at a minimum, deduct Medicaid payments and uninsured payments. But that's merely a limitation on otherwise broad authority. It doesn't foreclose the Secretary from accounting for other types of payments, especially when we have several textual cues here. Congress titled the calculation uncompensated costs. It came back 10 years later and said that only the uncompensated care costs should be included in the calculation. What's the significance of that? I actually looked into that. So the statute says uncompensated costs. That was in the original act itself. What significance can we give to the fact that that's almost like a statement of purpose or whatever? I mean, is there some significance to the heading, do you think? The heading is definitely significant. And the Supreme Court has said that headings can shed light on ambiguous language. So it's something the Secretary certainly can and must account for when determining what costs incurred means. And certainly in paragraph J2C, which is the auditing and reporting provision, where it says only the uncompensated care costs shall be included in this very calculation, that is clear text, Your Honor, that the calculation should reflect uncompensated costs. I was just going to say, what about the meaning of the word incurred? I mean, I find it interesting that the statute doesn't just include the word costs but includes the word incurred. And so what's the government's view of that? Incurred is significant because we have several cases in the Medicare context where the statute says costs actually incurred. And this court in Kindred Hospitals and several other courts have read that language and said that it upheld the Secretary's determinations that that reflects offsetting payments. This court explained that, for example, if a provider makes a tax payment and then is later reimbursed, it did not actually incur any cost because those payments functionally reduce the costs. So incurred naturally reflects, and it's in the case law, that that reflects offsetting payments, consistent with Congress's description of the term as at least deducting Medicaid payments. Well, let me give you a counterexample. So I looked up the definition of incurred, and a common definition is to be liable to or subject to. And presumably until the hospitals get reimbursed, they're subject to these costs. These are unreimbursed costs until eventually they get paid by private insurers or Medicare. And so isn't the incurred point really a question of timing, whether you look at it after reimbursement or before reimbursement? Because it doesn't happen simultaneously when they actually have the expenses of treating the patients. These audits, Your Honor, are done three years after the services have been provided, so it's necessarily a retrospective inquiry. In addition, the second sentence of paragraph G1A talks about state and local payments provided for services to indigent patients. That sentence supports our reading because it shows, it says that those payments shall not be considered to be a source of third-party payment. That tells us that Congress presumed that the secretary may account for other types of third-party payments. It carved out a specific type of payment that it did not want the secretary to consider, so as to not disincentivize state and local governments from making these payments. But it's strong evidence that the secretary would account for third-party payments in the calculation. And, of course, the legislative history shows that Congress intended for dish payments to help hospitals meet the costs of treating these patients. The plaintiff's approach does exactly the opposite by allowing them to ignore the costs that help them meet, sorry, ignore the payments that help them meet those costs. This is not, the final rule does not aim to get more money back for the federal government. It's about making sure that these funds, the limited pool in Missouri, for example, go to the hospitals that need them the most. Let me ask you a little bit about history because your brief says, oh, we're just continuing longstanding policy. Right. And yet you just said that there were overpayments of $27 million to the Truman Center in 2011. I can't imagine that hospital thought it was disobeying the law or not playing by the rules. So what is this basis for continuing longstanding policy? Sure. Allow me to clarify, Your Honor. The first year, what were you doing in 93? And what were you doing in 2003? And then what were you doing in 2008? The first year that the rule, the auditing requirement, the rule was from 2008 when the Secretary promulgated the rule. The first year that we saw that audits were required that actually had financial consequences for the hospitals were for services provided in 2011. And those audits were submitted in 2014. So that's why we're seeing this arise in your- No, Your Honor. Was that explained in the Federal Register materials? The Federal Register explained that this was a clarification of existing policy to make it clear in the text of the regulation to address the problem that- But no hospital had ever been, as a practical matter, subject to this rule before then, right? Your Honor, it's always been a calculation of uncompensated costs. And the informal guidance- With what practical impact? There was no- Hospital administrators and the state. So if you want to look at pre-2017 rule, the Secretary said in the preamble to the rule in 2008 that Medicare payments should be considered. And in 2010 issued- There was one little paragraph on that. But in 2010- Very passing reference. In 2010, the Secretary issued informal guidance explaining that these payments should be deducted. And the auditors- That's why the audits reflect- Let me stop you there. What enforcement was going on with these wonderfully clear pronouncements? What were hospitals actually being required to do differently? Well, the audits in 2011- You're talking about the Secretary saying this and pronouncing that and explaining this. And then finally you get a rule. Do it. What were they doing up until then? That's why we see over- That's what they felt like, right? No, Your Honor. That's why we see the overpayments in 2011 that plaintiffs are challenging is because the auditors in the states were following the FH- How are you going to enforce that in a state like Missouri, which is a redistribution state? If you prevail in all these challenges, then what happens? Does Truman cough up $27 million to someone? So the final rule takes effect for future audits to which the final- No, $27 million that you just talked about. The final rule doesn't apply retroactively, and CMS withdrew the FAQs, the informal guidance, because of the notice and comment problem that this court identified. So the final rule only applies to services provided- So it's a new rule, and it's a change from a practical standpoint. It's a change of policy, which doesn't preclude the Secretary from doing it, but does require more careful explanation. Well, Your Honor, respectfully, we wouldn't have had the litigation in this court and the case before this court in children's health care if that weren't the Secretary's policy. Plaintiffs challenged it because they said it needed to be in a rule, but that was the Secretary's policy. Yeah, and then you did the rule. And the reason you had to do- we said do the rule is that you were changing the rules. And when you change the rules, you have to be more procedurally careful. Your Honor, I don't think the Secretary had to say, this isn't a change from our policy that we've had and that's written down, but even if it were, then this would be reasonable. I give you Supreme Court cases where the failure to do that has been significant. That's- the context is- It's not on the top of my head, but I've written about it. And I see I'm into my rebuttal time, Your Honor. That's usually a situation where the agency, for example, has completely failed to acknowledge existing rules, or this was just not the sort of situation that the Supreme Court has provided as an example of. This policy is exhaustively explained in the final rule. All of the arguments are addressed, the policy reasons, the reading of the statute, and it's not a change in position. I'll reserve the- But you didn't have an enforcement position. What's the enforcement position now? With compliance, is this more paperwork or is there- is somebody in the state of Minnesota or the state itself going to lose federal money for noncompliance with the 2017 rule? Those audits will be done in 2020. Yeah. And if there are overpayments, then those under Missouri's plan would be redistributed to other hospitals in the state. Or else? What's the or else? From the federal government. If there are no other hospitals that are eligible for the funds, then- No, no, no, no, no. Oh, I'm sorry. The states and the hospitals say, the heck with you. We're going to do it our way. This is a pool of money, and we're going to distribute it the way we in the state of Missouri think is appropriate. Now what are your enforcement powers? If the state of Missouri refuses to follow the final rule, Your Honor? Or a hospital in Missouri won't go after it. Well, in that case, then- Missouri overpays in distributing. And your agency calls- your client calls them on it. And they say, well, we're not going to do anything about it. So the audits should reveal the overpayments. And then if Missouri would refuse to redistribute them or repay to the federal government, then, yes, the agency can issue a disallowance to disallow the federal funds. If the rule is upheld and lawful, it can enforce the rule. Against the state. Correct. This is a pool of- the federal government is providing these federal funds, and Congress provided that these payments shall not exceed the uncompensated costs. This is Congress mandating a cap on the payments. So why isn't that the appropriate time to litigate this? I'm sorry? When that happens, when there is a conflict between the state and the federal government over the administration of the 2017 rule, then now we've got a real controversy. Why don't we wait for that? I believe the hospitals have challenged the rule now because looking forward, they are- I'm going to talk to them about standing, too. Very well, Your Honor. Thank you. Ms. Iman? Good morning. We have a couple of visuals we'd like to use during our discussion this morning. So if it pleases the Court, my name is Barbara Iman. I'm here representing the Missouri Hospital Association today. The problem with the government's argument is that it seeks to selectively shoehorn the concept of payments. Can I start with Article III? If some hospitals get what the government now views as a double payment, who picks up the tab? Who loses? And it seems to me it's either other hospitals in Missouri or it's the federal taxpayer, and I'm not sure which it is. If a hospital is paid more than the hospital-specific limit that's set out in the final rule from 2017 forward, then under the rule, the state- What injured party, what party suffering actual injury are you representing? The hospitals. I'm representing the hospital association. Because it seems to me if this is a redistribution issue, and there is no specific hospital here in the position of, say, Truman, which is a potential loser, and it's a zero-game sum for your membership, then tell me a case where there's associational standing for an association whose membership in total has no actual injury, but particular members are winners and losers. So there are members of the hospital association that would clearly lose under this final rule. But am I right that as Missouri is administering the DHS program, it's a zero-sum game for your membership? Maybe yes, maybe no. Okay, I don't know. Who picks up the tab if it's no? Then whatever overpayments that can't be redistributed to other hospitals would get refunded to the federal government. But the point here, really, is that the association itself has decided, and its board has voted on bringing this lawsuit because of the entire way the DSH program works. I don't think the association is any different than every plaintiff in federal court who has to have actual injury to have standing. And I don't see actual injury to your membership in total. The association has standing through the injury to individual members of the association. I've always seen cases where the individual member is joined by the association as co-plaintiffs. I've never seen one like this where the association membership has no actual injury, and the only plaintiff in federal court is the association. The association does have injury to the extent that DSH dollars are lost to the state of Missouri and refunded to the federal government. The association as a whole loses. Wait, speculative. I mean, we're in Lujan territory with that. Well, so there are injuries to specific hospitals in the association's membership. I would like a case where the association with no actual injury to total membership is allowed to proceed on behalf of some members who are not there as plaintiffs. Well, I would submit that there is injury to the association as a whole. Are you aware of such a case? I am not. I doubt that there ever has been one. Well, we can research and then submit to you afterwards. But for now, anyway. Turning to the statute, costs incurred. So incurred to me seems to be pretty significant because if the hospital's position is right, Congress easily could have just used the word costs. But they used the word costs incurred, which indicates liability. In some dictionaries, it implies losses, that it's actually costs that are losses. And so I'm just trying to figure out how that's consistent with your position. I had a conversation with opposing counsel about it. Right. So incurred is the verb in the sentence. It's the costs that are incurred or experienced by the hospitals. Incurred, there is a separate reference to the concept of net, and that's different from the reference to costs incurred. So in this case, as our graphic here shows, costs incurred are simply the expenditures that the hospital makes on providing patient care services. It's not net costs. Yeah, but I think you're making the same mistake that Judge Kethledge made in his Sixth Circuit opinion, which is he talked about costs in a vacuum. Right? He didn't really talk about costs incurred, and you said it's the losses to the hospital. Well, the losses to the hospital, if they're paid back by private insurance and Medicare, those aren't losses to the hospital, are they? Those are costs that the hospital experiences in the first instance, and then it's reimbursed through payments, which in this case, unlike the cases the government cites, in this case are payments that are reimbursement for services provided. It's a fair market exchange of value. The cases that the government cites, Kindred and that line of cases, involve payments that the court treated essentially as rebates or refunds. So it offset the costs incurred. It wasn't a payment for services provided. And, in fact, in the Kindred case, I would submit, that was precisely the question at issue. Were these Medicaid payments, in which case 100% of the costs would have been incurred, or were they rebates which offset costs? The problem I'm having with this is, and I didn't fully appreciate this until opposing counsel brought it up, is that, and I realized they were auditing requirements, but they're auditing requirements three years later. And three years later, all the Medicare payments and all of the private insurance payments when we made, I think there's even rules that say the private insurance has to pay within a certain period of time, six months or a year. And so those costs will not be incurred by the hospital when you do the auditing three years later. They certainly are. They are costs that the hospital has experienced. It's like if you think of expenses and revenues on an accounting ledger. They stay on opposite sides of the ledger until you get to the bottom line. That's where the concept of net appears, is at the bottom line. Because you have net expenditures at the end of the day doesn't mean that those expenditures weren't real in the first instance. So if I give somebody an MRI and it costs $2,000 a hospital, and then I get reimbursed, and this doesn't happen, buy a private insurer for $2,000, the whole amount, you would still say that you get reimbursement from the federal government for the $2,000, potentially in terms of the cap of Medicaid payments. Well, so that's, I think, where the government has a fundamental misunderstanding of what the HSL, the hospital-specific limit is, and in fact what DSH is. DSH is not reimbursement for specific services provided, and the legislative history makes this very clear. DSH was intended to be supplemental funding for hospitals serving a large number of low-income patients who incur extra costs in serving that population, and these are costs that aren't necessarily included in the HSL. The legislative history mentions social service costs, public health costs. These are extra expenditures that these hospitals incur, and Congress wanted to encourage these hospitals to continue to keep their doors wide open to these patients. There's another textual problem you have, and that's the uncompensated payments heading. Sometimes the headings are added by, it's not the reviser of statutes, but whatever the federal equivalent is. This was actually in the statute, the act that Congress passed. It talked about uncompensated payments. And so I'm wondering how that fits in with your position. Well, the term uncompensated costs is not some- I meant costs, yeah. Well, it's not some predefined, you know, they talk about dictionary definitions. It's a term of art, and in this case, the term uncompensated costs is defined by the terms of the statute. It's costs incurred- That's easy to say, but where do you get it as a matter of statutory construction? How do we decipher that this is a term of art and not subject to plain meaning analysis? It is subject to plain meaning analysis, and the plain meaning is the language of the statute. It's not truly a term of art, then? Well, if you look at the term uncompensated costs throughout the health care statutes, it's going to have different meaning in different contexts. In the Medicare context, the term uncompensated costs is entirely different, and we explain that in footnote 7. Here, uncompensated costs is defined by the terms of the statute. That's what it means in the Medicaid dish context. Costs incurred net of payments under this subchapter. Payments are under this subchapter, and that language under this subchapter limits the understanding of payments. It's not net of payments, in which case the secretary would have full discretion to determine what payments mean. Here, Congress added limiting language under this subchapter, and the secretary's interpretation would read that language right out of the statute. Now, the third point, which I think you were going to get to, is, so you've got this phrase, the costs incurred during the year of furnishing hospital services, and then you have a parentheses with some more information. Would you agree that the parentheses is sort of defining that phrase, or do you view the material in the parentheses as being something different? The material in the parentheses, so you have costs incurred as determined by the secretary, and then the netting happens separately from the costs incurred. Again, that term is not net costs. It's costs incurred net of payments under this subchapter, and it's only those payments under this subchapter. For the secretary's interpretation to work, they have to define costs incurred as being costs, less Medicare and commercial payments, but not less Medicaid payments. But, see, textually I don't think that works because your argument would work if the net of payments was outside the parentheses. But the fact of the matter is it's in the parentheses with as determined by the secretary. So maybe I'm wrong about this, but I view that entire parenthetical as defining what costs incurred are. Then there would be no need for net of payments. If costs incurred can be determined by the secretary as being net of whatever funding the secretary wants to put in there, charitable donations, would that be a reasonable? Well, but that's the superfluous argument, and I don't think that works either because the problem with that argument is one could conceive of a way where you say net of payments. That's net of Medicaid payments is actually just a command to the secretary that when they determine costs incurred, they have to include Medicaid payments. They can include other things, but they have to include Medicaid payments. But that's like saying and, you know, going to Judge Ketledge's concurring opinion, that's equivalent to, you know, children under 12 are admitted free and the secretary deciding that also children of 13 years of age are also admitted free. You don't need to go outside. You don't need to add the word only to that phrase in order to make it clear that it's only children under 12 that are admitted free. But, see, that's not precisely right either. That's a false analogy because you could have a situation where the secretary determines the costs incurred, and let's say the secretary just says private insurance payments and Medicare. I don't know why the secretary would do that. Well, Congress says, no, I want Medicaid payments to be part of the net as well. And so what they're doing is they're setting out that the secretary has to include Medicaid payments. But that wouldn't make ñ I mean, that doesn't really make sense because it's very clear that if you're going to net out payments, any payments, you're going to net out Medicaid payments, and the secretary, the government, admits that itself. So why add those words under this subchapter if they didn't have the limiting effect of just here are the payments that are being reduced? You know, Congress knew how to refer to third-party payments. They did it twice in this same provision, in other parts of this same provision. They didn't do it here. As determined by the secretary and net of payments, meaning the secretary has substantial discretion, but not to go contrary to that particular. Well, it's ñ Net of Medicaid payments has to be within the exercise of discretion. It doesn't limit the rest of the discretion. I would submit that costs incurred, the secretary has full discretion to determine what costs are in and what costs are out. What about vendor year-end payments, medical suppliers, supply companies, year-end rebate payments calculated annually based upon volume of purchases? Yeah, that's a different type of payment. That's a rebate. But your whole brief is payments versus costs. But our brief is payments that are reimbursement for services, fair market exchange of value. We're not talking about rebates. The secretary has added Medicare and commercial insurance and says that reduces the costs incurred, when it doesn't. Those costs remain on the expense side of the ledger. Those reimbursements come in. If there was a manufacturer rebate at the end of the year, then yes, that reduces the expenses. But this is reimbursement for clear services provided, and that's a different animal. Well, I don't know that there are many accountants that would find that very consistent with reality. As you said early on in your argument, what was Congress's purpose in this whole plan to make sure that these hospitals who want disproportionate costs, what was Congress trying to accomplish? Yeah, that's a great question. Why don't we, the costs incurred, if we decide, if we knew what Congress intended, we should interpret that term. What is the term? We'll give it a protean meaning. We'll give it the meaning it needs to carry out the intent, or a Pickwickian definition of the word. Accomplish the result that you think Congress wanted to accomplish. What Congress was— What the government thinks it wanted. Your group has a different view of life, but you're interested in money. Congress is interested in serving the public, to put it to a romantic term. Well, in this case, what Congress was interested in doing was making sure that these hospitals, and Truman Medical Center truly is the sort of poster-board child of the type of hospital that Congress was trying to protect, that a hospital like Truman could continue to serve low-income patients and incur all those extra costs that are necessary to incur in serving the population. Originally, DSH did not have a limit on it, and states were free to pay hospitals as much as they wanted to, and the legislative history describes how some hospitals were paid more than their total costs of operations. So Congress wanted to come in and put a limit on it, but it's just a limit. It's not a rate-setting exercise, and that's how the government treats it here, as if Congress was, in the HSL, was setting rates for— treating equally all your members. So that heavily reimbursed hospitals, regardless of their share, don't get a larger share of this limited funding than hospitals who don't have that extent of reimbursement proportional to the DSH people, the indigents they're serving. So isn't that—I mean, that's not rate-setting. And why isn't it—why wouldn't Congress intend the secretary to exercise sophisticated discretion in that equalizing task? Well, I think you've articulated the secretary's policy preferences here. Very clearly, that's their policy preference, but that's not what the words of the statute says. And even if Congress intended something different, the words of the statute are what you— I agree with Judge Strass. Your textual argument doesn't get you as far as you think it does. Well, you need to follow the words of the statute. And, you know, in Lamy v. U.S., the Supreme Court said, our unwillingness to soften the import of Congress's chosen words, even if we believe the words lead to a harsh outcome, is longstanding. It results from deference to the supremacy of the legislature, as well as recognition that congressmen typically vote on the language of a bill. If Congress enacted into law something different than what it intended, then it should amend the statute to conform its intent. The secretary here is making its argument to the wrong branch of government. These are arguments—if they truly believe their policy position, they should make their arguments to Congress, not to you. In other words, we're not supposed to be pulling the government's chestnuts out of the fire? Well, you're supposed to be interpreting the words of the statute as Congress enacted them, not as the secretary wishes they were. Let's suppose that we think that there's two reasonable interpretations here. There's your interpretation and the government's interpretation. And the government's interpretation, we conclude, is reasonable for many of the reasons I've stated. Doesn't the government still win under Chevron? The only way you win, at least from my point of view, and you can correct me if I'm wrong, is if you say the plain language of the statute, only your interpretation of that is reasonable. Well, I think it very clearly is a step one analysis, and I do believe that the plain language of the statute is clear. But even if you get to step two, the government's interpretation is unreasonable. C-10 of the statute defines costs incurred as costs less Medicare and commercial insurance, not less Medicaid. That's a nonsensical interpretation of the costs incurred. That is not a reasonable interpretation. That cannot survive a Chevron step two analysis. I see my time is up. Thank you very much. Thank you, Your Honor. I think Judge Strauss made the important point that the parentheses do not end after as determined by the secretary. That makes it quite clear that the secretary's authority is not limited to a determination of gross costs when you look at the parenthetical as a whole. Even if plaintiff's reading is plausible or even reasonable, it's not the only reading. Congress could not have unambiguously required the secretary to ignore this very substantial compensation that hospitals receive from Medicaid patients who have additional insurance. This does result in that double payment scenario that you mentioned, Judge Strauss. And so the question here is whether the secretary reasonably interpreted the statute pursuant to an express delegation of authority to, as the secretary explained in the rule, ensure that limited dish resources are allocated to hospitals that have a net financial shortfall in serving Medicaid patients. That's a reasonable interpretation, and we would ask this court to reverse the judgment of the district court. Thank you. Thank you, counsel. It's thoroughly briefed and very well argued, but it's very complicated. We'll take it under the knife.